Good morning, and may it please the Court, my name is Palmer Huvestal. I'm an attorney from Helena, Montana, and I'm appearing on behalf of Mr. Carpenter. We have five minutes, and so the issue that I'd like to address on behalf of Mr. Carpenter is the shortcut procedure that was utilized by the District Court to admit certain emails. Admit what? Emails. Oh. You're talking about the business record exception? That's the issue, Your Honor. And there were approximately 61 emails, more than that as well, that were admitted pursuant to a shortcut procedure. In essence, the government asked the Court under Rule 104, pursuant to a certification from an employee from Yahoo, to admit all these emails. Was there a stipulation that the witness, the custodian of records, need not be called to authenticate the record? No, Your Honor, at least not on behalf of the District Court. Was there a hearsay objection to the lack of the custodian's testimony? Yes, Your Honor. I think there was a written brief that was submitted. The Court held a hearing and, in essence, ruled that the emails would be admitted. Well, what I'm interested in is the custodian of records filled out an affidavit saying, these are business records kept in the normal course of entries made at or about the time of the condition or event portrayed therein. But he wasn't on the stand, said he could be cross-examined and see what his knowledge of those facts were, correct? That is exactly right. And the objection was made timely. How did the judge rule on that? He overruled the objection. On the grounds that it? Apparently that they were business records. The only ruling that we have is from the bench, and he basically says, I'm going to admit subject to additional objections for relevancy and prejudice these records. And in this case, where Mr. Carpenter disputed the fact or the contention by the government that he was the author of the emails? I'm sorry, he wasn't the author of the emails. He was challenging whether or not they actually came from him, is that correct? That's exactly right. I think that's the argument that was made below. And I think the judge said, well, that goes to the weight, not to the admissibility. I don't think that he even made that ruling, Your Honor. Basically he says. But isn't it, I guess even if the judge didn't say that, doesn't it go to their weight and not to their admissibility? I mean, the jury would be able to, you know, based on the questioning done by counsel, and I don't know if that was you or not down below, the jury would be able to decide, you know, if there should be any credit given to that argument. I don't think that he says that. He basically says that he has a picture in mind. Who's he? I'm sorry. The district court. Even if he didn't, though, don't they go to the weight, not to the admissibility? I mean, that's what this whole business records exception is all about. Yes. And I'm trying to remember, I remembered the exact issue, and I'm trying to remember exactly how to frame the answer here. Did you have anything else regarding Mr. Carpenter? No, that was the only issue, Your Honor. But the foundational problem was that Mr. Carpenter was not permitted to cross-examine on issues that potentially related to whether he was the author of those records. But the testimony was not that he was the author. The testimony was that these emails came from certain email numbers or certain addresses. Yes. It was circumstantial evidence that he may have been the author. But I understand your point being that the affiant may very well have testified had he been called to the stand. I didn't do any of this affidavit. It was all done by counsel. I don't know what I'm talking about, and he asked me to sign it. That's correct. Which if he testified, there wouldn't be sufficient foundation for the records. That's correct. And you were deprived of that opportunity. That's correct, Your Honor. All right. I'll relinquish the podium to co-counsel. Thank you. Thank you, Your Honors. I'm Mayo Ashley. I represent Mike Campa, also known as Mike Hurdle. I think Mr. Campa is very seriously involved in all of the co-appeals here in this case. The way I see it, and co-counsel may argue differently, but we actually have two problems here. Number one, the original order which froze a bank account in California belonging to one of the co-defendants, Mr. Gall. The $900,000 that was in that account came as a commission to my client, Mr. Campa, from an outfit called, for shortness, Crystal Pistol in Arizona. I submit that at that point the court, and it was requested to by prior counsel, the court should have had a hearing and said, where did this money come from? Mr. Campa testified that it was a commission. From procuring $4.5 million worth of gold mine, right? Exactly, Your Honor. And which is not, which was never indicted as a fraud in this action. Oh, it was not. Where the $4.5 million came from and where all of the restitution, my client's increased sentence, and I submit co-appellate's increased sentences, came from this $4.5 million. Do you have any authority, counsel, of the Supreme Court that says that it's a violation of the Sixth Amendment to deprive an individual of some funds from which he can hire private counsel? Well, no, Your Honor. My whole argument here goes back to this $4.5 million. Nobody knows where it came from. So what? I mean, so he suffered a $900,000 freeze on his bank account. Why is that a basis for reversing the conviction in this? He pleaded guilty, didn't he? He did plead guilty. He did not plead guilty, however, to any involvement in this Arizona gold mine. He pleaded guilty to obtaining. Is your argument that if he'd had $900,000, he wouldn't have pleaded guilty? No, but he would have had counsel who could have advised him one way or another, Your Honor. And had he had counsel, he wouldn't have pleaded guilty? No. So what difference does it make? It makes a substantial difference in the sentence, Your Honor. His sentencing hearing, the. . . Well, this goes not to guilt. This goes to sentencing. Sentencing, yes. The government said that without that $4.5 million, they could only prove 675,462, which is substantially different than $4.5 million. So you're challenging whether or not the gold mine proceeds were relevant conduct. Tell me why it wasn't relevant conduct. I think that's what you're arguing. I'm sorry, Your Honor. I think you're arguing that the gold mine proceeds were not relevant conduct because that's what the court determined, that they were relevant conduct for purposes of sentencing, that it was foreseeable, that they were somehow connected, that these funds would have come into play based on all of the activity of the defendants. I guess I'm just trying to find out why the court was erroneous in making that finding, as you're, I think, trying to argue. Well, the indictment does not mention at all this Arizona gold mine. That was, if indeed it was a fraudulent scheme that was over and above what's charged in the indictment, no one was aware that that was going to be, in point of fact, it was a motion in limine prior to the trial of the other defendants, that that could not be mentioned. But what didn't your client use funds from the gold mine to pay Mr. Carpenter for what he was doing overall in the conspiracy? Well, as I recall, Your Honor, there was no testimony that ever said, he and his wife Suzette withdrew some money from this account in California. Mr. Ashley, your time is up. Oh, I'm sorry. Thank you very much. Yes, sir. May it please the Court, Your Honor. Jeff Foster, attorney for the appellant Suzette Gall. I was trial counsel on this case. Up until now, you haven't had any trial counsel. So I want to jump right into it. The issue here is not only was it not relevant conduct, Your Honors, it was not relevant at all. And so we want to go right to sentencing, not to guilt? No, no. I want to start out at relevance on whether this $900,000 should have ever been injected into this trial in the first place. And our position is it shouldn't have been. So there were two schemes going on, and one overall conspiracy, according to the government. I will ask the government why they didn't charge the gold mine scheme. But the case law supports that you can have multiple schemes and one overall conspiracy as long as they're connected in some ways or there is sufficient evidence to support that one knew about the other. Now we're coming back hindsight after trial and we're saying, well, this is gold. We're calling it the gold mine money. At trial, none of the trial counsel or the defendants even knew what this $900,000 was. All we knew that based upon our investigation was that none of the money in this account came from any of the investors that were charged in the indictment. So no money from the investors went into that account, and none of that money made the circle into the other conspiracy. So from all we knew at trial was that this $900,000 was a legitimate proceed from something. What about the $50,000 that was withdrawn by your client's son at her request? Yes. So there is, although the government wants to infer that $50,000 was dropped off in some sort of clandestine cash handoff that day, there's no direct evidence showing that the $50,000 went to Stephen Carpenter that day. Well, they were going to give it to Mr. Carpenter. It appears. I mean, and I guess we have to look at it in terms of whether a reasonable inference and whether looking at the evidence, the light most favorable to the government, the jury could conclude that it was for that purpose. Well, I think if you're going to the sufficiency of evidence, then you're looking at it from that. Oh, I'm sorry. What are we looking at? I thought you were backing up. I think it's irrelevant and overly prejudicial. From the minute we cross-examine agents. So what are you arguing? Are you arguing sentencing or are you arguing sufficiency of the evidence? I'm arguing that the presentation of the gold mine, the $900,000 in the bank account, Christian Gall doing business as Suzette Gall. You'll have to speak up, Counsel. The presentation of the evidence of the $900,000 in the Christian Gall doing business as Suzette Gall bank account. Once we cross-examined Agent Wood and established that none of that money had anything to do with the crimes charged in this indictment, we should have never talked about any of the evidence that logically flowed from that. Didn't Suzette get $50,000 in cash from, was it Christian, who had the bank account with the $900,000? No, there's no direct evidence that she gave $50,000 to Stephen Carpenter. Oh, I mean her and her son. Did I ask you that? You asked. Suzette got $50,000. Yes. From Christian. Yes. From the gold fund. Yes. She took the $50,000 and gave $1,000 to Carpenter, correct?  She testified that she gave $1,000. That took place. The $1,000 took place after she got the $50,000 in cash. True? It did. If you take all intendance in favor of the government, cannot the jury find that part of the $50,000 was the $1,000 that went to Carpenter? They can make that inference, Your Honor. But I guess my point is that they shouldn't be allowed at any point to make that inference because none of that money has anything to do with the crimes charged in this indictment. Was that argument made or discussed during trial? Oh, absolutely, Your Honor. Yes. And it wasn't successful? It was not successful. Okay. And so do you agree the standard, I mean, that we look at it now that it's happened and you're arguing that it shouldn't have been, you know, relevant or shouldn't have been, you know, part of it or wasn't enough to implicate your client for the gold mine fund? I mean, we have to look at it in the light most favorable to the government, don't we? On a sufficiency of evidence standard, Your Honor, I'm arguing that it was relevant and prejudicial to admit that evidence in the first instance, which I believe is a harmless error standard. I see. And so in the words, and I'll just end it at this, in the words of Justice Rutledge, when you're doing the harmless error standard, the inquiry cannot be merely whether there was enough to support the result apart from the phase affected by that error. It is rather even so whether the error itself is a substantial influence. If so, if one is left in grave doubt, the conviction cannot stand. Thank you. Thank you. Good morning, Your Honors. My name is Mark Meyer. I represented Christian Gall at trial. Just following up on what Mr. Foster's comments with respect to the introduction of the Arizona gold mine evidence, as I indicated in my brief, the way the government handled that allowed them to essentially steal second and keep their foot on first. And by that I mean they painted the $900,000 funds as being fraudulently obtained, and once they paint them as fraudulently obtained, it shades the testimony that the jury heard regarding all the surveillance on June 11, 2012, when my client, Christian Gall, went to the credit union and withdrew the $50,000 and gave it to Mike Camp and Suzette Gall. And then he left and went somewhere else. They were surveilled to the hotel. Allowing the government to paint those funds as fraudulently obtained essentially prejudiced my client's ability to have a fair trial. What I understand in the evidence, or at least with respect to what you're talking about, Agent, I think it was Smaldala? Smadala. Smadala testified that Christian learned from Andras that Mr. Camp obtained the funds deposited in Christian's accounts through fraud. Apparently there was some testimony. And I'm just trying to figure out why doesn't that permit an inference that Christian knew that the oil and gas scheme was a fraud. None of the money deposited in my client's account came from any of the oil and gas investors. No, I understand that, but that wasn't my question. My question was, you know, why doesn't the fact that Christian learned about fraudulent funds and being deposited from Andras, why doesn't that permit, you know, a reasonable inference that Christian knew that the oil and gas scheme was a fraud? Because Christian's statements were that when he was interviewed by Agent Smadala in November, at the start of the interview, said, no, I didn't know they were fraudulently obtained, but then said, yes, I did. You know, I was told by my brother that Mike Camp had a criminal history and that these funds could be fraudulently obtained. And as he was sitting there in November 2012, said, yes, I had suspicions that they were fraudulently obtained. I didn't know that when I was asked to allow him to transfer those monies into my account. The only reason the government called Agent Smadala was to get that one statement in of Christian Gall that, yes, he had suspicions that these monies were fraudulently obtained. They didn't ask him anything else. That was it. And then my client didn't, you know, deny that statement being made. The government also says it's unreasonable for the – given the amount of that money, $900,000 to come from the Arizona gold mine, that that somehow makes it unreasonable or should be looked at as skew. But as Mr. Schumacher testified during the sentencing hearing, the Arizona gold mine had a website up. They had a newsletter. They had a geologist talking about how this was an ongoing operation. And, you know, there's no evidence tying my client to anything having to do with the Arizona gold mine. He took the words of his stepfather at face value. Well, even if he did know that the funds in the bank account from the Arizona gold mine commission had involved CAMPA and CAMPA had a criminal history, what's the evidence of the connection between Christian's acts and the oil well drilling? The only action – only evidence is that the money was withdrawn and under the government's theory went from the bank account to Mr. Carpenter. Isn't it also, though, that the two brothers had a conversation, that his brother Andres was also parking money in an account and earning a commission for that amount and knew that it was fraudulently obtained through these oil and gas leases? And Christian's testimony at trial was that that conversation occurred, you know, at or about the time they were indicted. You've run out of time. Thank you, Your Honor. May it please the Court, Lindsay Larang for Appellant Andres Gall. I want to switch gears a little bit and address distinction between this case and the arguments or the cases presented in regard to the jury instruction that was provided. In Chiruta, as well as the majority of the cases presented by the government, the question there was whether or not an accomplice instruction was appropriate when given when an accomplice testifies for the defendant rather than for the government. The situation that we have here is the problem with that accomplice instruction being confusing, being contradictory to the standard instruction that jurors are to determine the credibility, the weight to be given to witness testimony. Additionally, Mr. Campa testified, as did Andres, and some of the statements that they made were quite in line with one another. Therefore, the concern with this is that when the judge instructs on viewing accomplice testimony with caution, that is transferred to viewing Andres' testimony with caution as well. The purpose of this instruction is to alert juries to the possibility of perjured testimony, but we assert that that is an argument that opposing counsel can make and that it was to elevate it to the level of an instruction gave it far too much weight, and again, because of the similarities in testimony between Mr. Campa and Andres, it was misleading to the jury. To distinguish in regard to the voir dire issue, the standard here is abuse of discretion. During a pretrial conference, the judge ruled that objections as to the admission of evidence made by one defendant were to be attributed to all defendants, and so from the beginning, when other counsel asked me to. I think you're going so quickly, you've lost me. Tell me what the instruction was and why it was wrong. The instruction was that an accomplice, Mike Campa, had testified and that they were to view accomplice testimony with caution. Anything wrong with that? Yes. What's wrong with it? The problem with that is that they were also instructed that as the jury, they are to determine credibility of the witness, and they are to do that by listening to or by viewing different factors, how they testify on the stand, any motive they may have, et cetera, and so the argument that an accomplice is going to save his skin is certainly something that the government could have made, but to put it in an instruction that the judge reads as the law of the case elevates it to a prejudicial effect. All right. The government indicated that, again, in regard to the failure to properly voir dire argument that the argument had been waived, and so again, questions or rather objections by one defense counsel were to be to all, and additionally, Payne, Toomey, and the government's case in ECWU were about the failure of the judge to ask questions that had been provided pretrial, and that happened in this case. Andrus provided proposed jury questions as well as joining in the arguments that his mother had made, and so the failure to ask questions on behalf of Andrus did not waive or at the actual voir dire did not waive that issue for appeal. What was the prejudice? Because you didn't say it in your briefs. What was the prejudice for failing to ask the questions that you had asked? The prejudice here is that based on the questions that the judge was asking, he was asking potential jurors to judge their own ability to be fair and impartial, and this has been addressed as something that is concerning in the cases that were cited, particularly in Gonzales. The court said that more frequently jurors are reluctant to admit actual bias, and the reality of their biased attitudes must be revealed by circumstantial evidence. And so we should have been given the opportunity to ask a question as basic as, have you ever been a victim of financial fraud? That was the type of question that was submitted. Because even if an individual said yes, and then they were further voir dired on whether or not they could be fair and impartial, we could have still used that information, determined whether or not a preemptory challenge would have been appropriate. And by not having those types of questions, we just couldn't do that. The government indicates that the court actually read the entire indictment to the panel, and he did. However, after reading the indictment, the follow-up questions were, have any of the panel members read or heard about this? Not whether the charges contained within the indictment were problematic for any of the jurors. But again, the prejudice comes with the fact that they were being asked to judge their own ability to be impartial, which has been determined to not be a fair question to ask jurors. We need to have the opportunity to at least know that these facts were in existence before, in order to get a fair and impartial jury, which is, of course, a cornerstone of our criminal justice system. Did the court ask, just a general question of whether there was any reason why a jury couldn't be fair and impartial? Yes, the court did ask questions such as, is there anyone who has in his or her mind a question about their ability to serve as a fair or impartial juror? One juror raised their hand and in a sidebar indicated that it was because they had been taking sleeping medication. The judge also asked if there was anyone who questioned their willingness to serve, and no one responded to that. I, as well as Mr. Meyer, asked questions about just kind of the catch-all in a desperate attempt to get anyone to reveal something that might be useful in this determination. After hearing the indictment, is there anything that gives anyone concern? But again, I believe that's putting too much burden on the jurors to volunteer in this large courtroom information that's very personal. I believe my time has run out. Thank you very much. Thank you. All right. Mr. Weldon? It might help if you were to follow in your argument the order in which the defendants presented themselves, starting out with Mr. Carpenter, then going to Mr. Campa, then going to Suzette Gall, then going to Christian Gall, and then going to Andres Gall. Yes, Your Honor. Could you do that, please? Yes, I can, Your Honor. All right. Ryan Weldon, appearing on behalf of the United States. I want the court to know that seated with me at counsel table is Mr. Rosted. He was lead counsel at the trial. What I'll start with first for the court, then, is the 902-11 certification, and that was an issue that was raised only by Mr. Carpenter. What the court should be aware of is that all defendants stipulated as to the e-mails except for Mr. Carpenter. He's the only one who didn't. That then prompted the government to file the 902-11 certification, and what we're dealing with are approximately 60 e-mails. So it exhibits 100 through 160. You didn't have the custodian from Yahoo there to identify the e-mails. That's correct, Your Honor. He wasn't available to see, to recross-examine this as a content of his affidavit. That's correct, Your Honor. Why isn't that plain and simple hearsay? Because the rule allows for that. That's what the rule contemplates, is that certification can be filed. And that's rule 902? 902-11, yes, Your Honor. Of the Federal Rules of Evidence, right? That's correct, Your Honor. And then the basis, and the one thing that I can see in the briefing, and I just want the Court to be aware of this, is there is some intermixing between the principles of foundation and hearsay. Of course, the rule that we're talking about is the 902-11 certification. So just be aware of that. The other thing, and this is more of a practical aspect, had the custodian been brought from Yahoo and there was a cross-examination on this point of did Mr. Carpenter send this e-mail, that custodian would have said, I have no idea. All you can say is this e-mail was sent from this address. Exactly. That's all. That's correct, Your Honor. And Mr. Carpenter clearly had the opportunity all throughout trial. Your position is that 902-11 is an exception to the hearsay rule for the authentication of business records, true? That is correct, Your Honor. Okay, fine. Absolutely. The other thing that I'll just mention on that topic is that really what we're dealing with are 11 e-mails of the 60 e-mails. All of the other e-mails were associated with other individuals. The 11 that dealt specifically with Mr. Carpenter that were under the 902-11 certification. To state that a little more clearly, people with personal knowledge who were victims came and authenticated those e-mails as well. There were only 11 that were the subject of the 902-11 certification that only dealt with Mr. Carpenter. And, again, I mentioned the practical aspect that had Mr. Carpenter's counsel wanted to address that issue with the custodian, they would not have been able to help with that issue at all. The other point is that the courts make clear that's the idea behind the certification so that we're not bringing these individuals from, say, for example, in this case, Yahoo, down in California all the way up to the state of Montana. Now, I believe the next issue that was addressed is my understanding was the gold mine, and I think that that's garnered a considerable amount of attention, so I will spend a little bit of time on that. Now, first, practically speaking, this gold mine issue was not charged in the indictment. The reason that it wasn't charged in the indictment is that that full case hadn't been worked up yet. The case that the government had was the Fort Peck Indian Reservation oil and gas scheme. So the reason that that was relevant, though, is that that money was used to pay co-conspirator Steve Carpenter, that $50,000 that came from Christian Gall's account. That was then transferred to Mr. Carpenter, and one thing that the court should be aware of when looking at this issue is that we didn't know the individuals. They were basically e-mails, calls, but we had no identification of anybody. That's why you have the surveillance team that then goes down to California. If Suzette Gall pays $1,000 to Carpenter, what is the relevance of the source from which he got the $1,000 other than to blacken everyone with another fraud which is not charged? That's correct, Your Honor, and that's exactly why you will see Mr. Rosted at SER 135 objects to that very issue. We did not want to get into this gold mine scheme. That was what the defendants wanted for this trial. It's not something that we brought in. What was relevant to the government was that money was transferred from Christian to Suzette to Carpenter. The source of the funds did not matter, and that's why you hear or you can see at SER 135, Mr. Foster asked Mr. Wood, and Mr. Wood did the analysis of the financials. Did you, referring to Chris Wood, personally do an investigation as to the gold mine in this case? Mr. Wood responds, I did not do an investigation into that particular aspect of this case, no, sir. Mr. Rosted says, Your Honor, we would like to lodge an objection and take up an issue outside the presence of the jury regarding the gold mine issues. Then the court says, well, I think the objection is well taken. It's sustained. You will not be making further inquiry of counsel into an issue in this case. It's not part of the scope of the charges in the indictment. Even the district court recognized that. Then just to go a little bit to the end of that, you can even see later at the very end of the case at SER 437, that is where Mr. Foster says, First, during the course of the trial, the government objected every time we tried to develop facts about the gold mine. The point of the government was that that was not relevant for purposes of the trial. It was not in the indictment. What mattered was the agreement between Christian Gall, Suzette Gall, Mike Campa, and the transfer of that money, those funds, to a co-conspirator in the Fort Peck oil and gas scheme. I have two questions on this. One is with respect to Christian, what evidence do we have that he knew about the oil and gas scheme and didn't he have to know for him to be convicted of it? Absolutely, and he definitely had to know. So the first part, and this extends even more beyond, he had to know that there was this conspiracy. But what's important for the court is that Mr. Gall, Christian Gall, probably didn't know all of the details because he wasn't as involved as Mike Campa. The court gave him credit for that by giving him a two-level reduction for a million dollars. But what he did know is that there was fraudulent money and that he was running the bank accounts. When the court looks at this case and how Mr. Rostad and I- Fraudulent money from the gold mine scheme, not from the oil drilling scheme. That's correct. But that goes to his understanding of he didn't know necessarily where any of that money was coming from. Right, so he knows that Campa is a crook and a fraud and he got $900,000 and he's got his signature power over the account. And he gives $50,000 to Campa's wife, Suzette Gall. Correct. Who's his mother. That's correct. And she gives it to Carpenter. That's correct. Where is there any evidence that Christian Gall knows anything about Mr. Culbertson, the leases he signed, whether the BIA approved the leases or not, whether they canceled the leases, what representations were made by anybody. Does he know anything about the oil drilling leases? He knows-so first of all, he knows not all of the details. There's no doubt about that, Your Honor. Does he know any of the details? Yes. And where is the evidence of that? So what he does know is that they are-it was a family affair, that they were working up in the Fort Peck oil and gas. He did know at that point. When he spoke with Andris Gall, he did know that that money was fraudulent that was coming in. That's absolutely correct, Your Honor. The money was fraudulent. What money? The money in the gold mine was fraudulent because the gold mine's a scam. That's correct, Your Honor. Where does-please point out to me the evidence that Christian had knowledge that there was some fraud involved in the oil drilling scheme. Yes, Your Honor. What he knew in this case was that that money was going to be pulled out and transferred. He pulled that money out. That was his whole role. He knew that money from the gold scheme was being paid to a carpenter. To a co-conspirator in the Fort Peck oil and gas scheme. That supposes that he knew there was a conspiracy with the oil. Get back to my question a third time. This is the last time three strikes and you're out. Yes, Your Honor. Right? Yes. Where is the evidence that Christian knew there was an oil lease drilling scheme? So, first one, money came to Christian Gall in the amount of $250 to his personal account. That occurred in 2011. Okay? And I will provide the court with that site. That's one example. $250 came to Christian's own account from whom? From Andrus Gall, his brother, Your Honor. From Andrus? Yes. And what is the evidence that that $250 had written on it? This is part of an oil drilling scam. Well, it has the domestic energy solutions on it. What? It has domestic energy solutions on it. It comes from a company that says domestic energy solutions. How does he know, though, that there's a scheme? I think the testimony is that he's told by Andrus, his brother. Correct. But the defense says it's after the indictment. So what we're asking you is what ties Christian at all to the conspiracy having to do with oil and gas leases? Because he's running the accounts, which is the gold mine, that is paying a co-conspirator for the fork pack. We know that the money from the gold mine pays Mr. Carpenter. How do we know and do we need to know that Christian knew that that money coming from the oil and gas was a fraud? Yes. What? Yes, what? What's the evidence? We need to know that it is a fraud. That's correct. Okay. And so what is the evidence that he knew that it was fraud? The oil and gas, not the gold mine. Because the money was being paid to a co-conspirator. But he had to know that there was a conspiracy. Correct, and he had spent. What evidence was there that Christian knew there was a conspiracy regarding the oil leases? So he, and I want to answer your question, but I need to provide just a brief explanation. No, no, just answer it by saying. Yes. Judge A.R. blank. Okay. So it would have been, because his entire point was to run. Not an entire point. Okay. For heaven's sakes, counsel, please be responsive. Yes, Your Honor. Give me a citation to the record or go to another defendant. Yes, Your Honor. He had, okay, the citation would be S.E.R. 473. That would be the 900,000 that Christian came in from the scheme. Then 50,000 of that went to Mr. Carpenter. And the reason why that's critical. No, 50,000 didn't go to Carpenter. 50,000 went to his mother. She gave him, she gave Carpenter $1,000. As far as we know from the evidence that you've cited, Christian didn't know Carpenter from Adam's ox. Oh, and he did know him. And the reason they knew him is because Mr. Carpenter had been over for Thanksgiving. There's no doubt about that. So what evidence was there that he knew that Carpenter, his mother, Andres, and Campa were all involved with Culbertson in making an oil drilling fraud? And I don't think he. This is the last time. Yes, Your Honor. And I don't think he did know Mr. Carpenter. Well, then that's fine. Let's call down another defendant. Yes. Let me just ask you. Because the family was, all the Gulls seemed to be, except for Christian, seemed to be pretty knee-deep into the oil and gas fraud. That's correct, Your Honor. All right. So there were leases that weren't really, that had been expired, and they're holding them out to be true, and there's all kinds of money going, and they're making claims to invest, and people are doing it. Andres has the account. Ms. Gull, the mom, seems to know quite a bit. They're taking vacations. None of the money from the oil and lease is going to oil drilling. That's correct. Is there any evidence? What's the evidence that Christian knew about that? Well, he was on some of the trips. So from 2009, he was there. Now, he only worked for Target. He worked as a youth pastor. But none of them had jobs in any way. Right. I guess what we're cutting down to is that certainly there's enough to draw the inference that there's a large amount of money placed into it he's told to hold. That's correct. Okay. So that's fishy. Yes. All right. And then he's asked to take out a large amount of money and ask for it in cash and, in fact, instructs the teller, don't count it out. And he does that on multiple occasions. So there are three times that he pulls out $50,000. Christian's up to his eyebrows in the goldmine scheme. That's correct, Your Honor. So what does he have to do with the oil lease scheme? Yes. And I think that this is our entire point of the case. The boys, the step-boys, Andrus Gahl and Christian Gahl, run the bank accounts. And why they're so critical, Your Honor, is that they have clean backgrounds. Mike Campa cannot open a bank account. No, clearly they were used for this. But we're just asking about Christian's knowledge. I think there's testimony about Andrus' knowledge about the oil and gas lease. We're just saying in terms, to be a member of conspiracy, you have to know the object of the conspiracy. Absolutely. So if the object of the conspiracy was to park somebody else's money, but that's not what he was charged with. That's correct. What he was charged with was he was moving the money for the Fort Peck oil and gas scheme. How he did that was he took money, the $50,000, that moments later was transferred to Steve Carpenter in payment for him. But it wasn't $50,000. You keep saying that. $1,000 went to Carpenter in cash handed him by Suzette Gahl, the mother of Christian who got the $50,000 out of the bank from the gold scheme. That's correct. Now, Ms. Gahl said that it was for a breathing apparatus. So there's really no dispute. I mean, we don't know exactly how much transferred. But there's no doubt that money was transferred across and that Mr. Gahl knew that there was fraudulent money. Which Mr. Gahl? Christian Gahl. That's correct. But fraudulent money from the gold mine. But he didn't necessarily know where all of the money came from, and that's the irony of this particular case. He knew. So you think that if Christian Gahl believes that the gold money was fraudulently procured and he hands some of that to Suzette Gahl and Suzette Gahl gives $1,000 to $50,000 to Carpenter, that taints Christian with knowledge of the conspiracy that Carpenter, Suzette, Andres, and Campa are doing on the oil lease scheme. If he knows that his job is to run the fraudulent money, yes. The fraudulent money for the gold scheme, if $1,000 from the fraudulent money of the gold scheme goes to Carpenter, without any evidence that he knew why it was going to Carpenter? That he knew why it was going to Carpenter? What's the evidence that Christian knew that Carpenter was getting paid $1,000 for hoodwinking oil lease developers? Well, viewed in a light most favorable to the government, the only connection between Mike Campa and Steve Carpenter was for this oil and gas scheme. And where is the knowledge, where is the evidence that Christian knew that the only connection was the oil lease? For the Fort Peck Indian Reservation. That he may not have known all those details. Well, then, of course he didn't know and you didn't prove it. Well, but I think Your Honor. Let's go to some other defendant. You're running out of time. Yes, Your Honor. Let me. I had another part to my question and that is you say that you didn't want to charge, the government didn't want to charge the gold mine scheme. They were reluctant to do it and offered an objection. But then it seems at some point then you ran with it. At some point, that's correct, Your Honor. And then just embraced it and including on sentencing with respect to the relevant conduct and which made a substantial difference in the sentences. I mean, the amount with the oil and gas was, you know, less than $100,000. I think it was $700,000, $800,000. But then when they get attributed all of them with the oil and with the gold mine, that raises it by $4.5 million. That's correct. So, I guess I'm trying to reconcile your position. If you weren't going to, you didn't really want to include it. You didn't think it was ready, but it certainly didn't hold you back from arguing for the upward adjustment. Absolutely. So, here's how it progressed at trial. Initially, the day before Mr. Campa pleaded guilty, his entire point was that he wanted to acquit his family of all of the conduct, that he was going to keep the blame, and that he was going to say that they had no idea about anything at all. Then you have on, so that was on April 25th of 2013. Excuse me, that was on April 22nd of 2013. And in there, there is a statement in the offer of proof that says, additional monies were being provided by the victims into a fraudulent gold mine promotion that operated at the same time. That was at the change of plea. The government alleged that, and that's at ER 83 in Mr. Campa's briefing. Now, the reason why that was relevant is Colonel Dumas had paid money into both the gold mine and into the Fort Peck Indian Reservation. So, he had been swindled by Mr. Campa there, and then he had also been swindled at the Arizona gold mine scheme. And I think that that's one issue that we're getting tripped up, or at least I didn't answer as clearly. If the court is asking if we think that this is one scheme, my answer would be that this is one scheme, that Mike Campa has never sold anything legitimate in his entire life. And you can see that in the record when Mr. Rostad is cross-examining him. You think the gold scheme and the oil and gas are all one scheme? Right. I think that we charged the Fort Peck oil and gas, but certainly they work together. And the reason for that is that they mix the funds all the time. It's constantly an intermixing of the funds. And you can see that here with the records that we have at sentencing, where, for example, there's the $900,000 from Christian Gall that is transferred, part of that to Steve Carpenter, a co-conspirator in the Fort Peck. Then there is $12,000 from the Arizona gold mine scheme that goes to Andres Gall. $9,000 of that is then transferred into Domestic Energy Solutions, which is the fraudulent corporation. And even you have the commingling of funds that Mr. Wood testifies to in the sentencing. And then you have, as well, Mr. Burns, Agent Burns, testifies at SER 195 that these two schemes are all working together. Well, I think you have two schemes. And it sounds like you are arguing under one overall conspiracy, and I think that's what we have to see if that's correct. And you highlighted different evidence to support the two schemes. You're saying it's one scheme. I think it's two schemes and one overall conspiracy. Correct. And then our question is whether that's sufficient, you know, to support the conviction of all of the defendants, and then more pointedly the relevant conduct, you know, that would add that much money to increase their sentences. And so for it to be relevant conduct, I guess they have to know that it was reasonably foreseeable. That's correct. And it has to be jointly undertaken criminal activity. And so you're saying that it is jointly undertaken activity by all of the defendants. That's correct. And it was reasonably foreseeable. That is correct. Now, just so that the Court's aware, though, the District Court didn't do that. The individuals who received the Arizona goldmine scheme included was Christian Gall, Mike Campa, and Suzette Gall. Andres Gall did not receive that, and neither did Mr. Carpenter. So those are the three individuals that the Court is dealing with for purposes of relevant conduct. Now, I did at least want to point out as well that this is something where it wasn't the government who mixed these funds. The defendants mixed these funds, and they continually go back. They call them mooches, where they solicit one individual. Once they've taken the bite and been defrauded, then they repeatedly come back for them. And what they'll say, for example, is they will say, you invested $10,000 with me. You've lost that money. If you invest another $5,000 with us, we'll give you credit for that. And that was a continual sort of a tactic that you can see. And that runs, for example, I mentioned Colonel Dumas. He was taken by both the Arizona goldmine scheme as well as the Fort Peck oil and gas scheme, and that's at SER 119. Then you have Mark Hall. Mark Hall was taken by ATM machines. That's at SER 88. Phone card machines, New Age products, key gas that Mr. Campa was involved in. So you have that continuation where there is what we call the double punch. And you can see that with domestic energy solutions and then U.S. oil and gas. So with Mr. Campa, he comes in. He says that the amount for domestic energy solutions is X dollars. The victim pays that money. In comes Mr. Carpenter after that and says that that money should be credited, and you have to pay an additional amount of money to keep your investment. So that's the jointly undertaken criminal activity that it was all working together. And if you were just to look even at the restitution amounts for that, again, that link that we have is the use of money from Dean Halefka to the Fort Peck oil and gas scheme because they're providing that money. It's directly harmed. One thing that was brought up in the briefing was the issue of the case, the Paroline case. It was brought up in the reply brief that basically said that we have the rule of Huey. And Huey originally occurred by saying that you have restitution, and if there are any acquitted counts, it can only be for the count of conviction. Congress amended that, saying that you can broaden the idea of a victim. In other words, counts that aren't convicted. And in this case, you have, for the definition, a victim means a person directly and proximately harmed. The reason Mr. Halefka, from the oil and gas scheme, was directly harmed is that his money was used to profit the Fort Peck oil and gas scheme. And the way that I would think about this, or at least it's in my head, is the idea of a grocery store. Mr. Kampa sells nothing. He does that repeatedly. Right at this time, it was the Fort Peck oil and gas scheme, the Arizona goldmine scheme. If he were out, it would probably be... Halefka was hurt by the goldmine scheme. That's correct. But he wasn't hurt by the oil drilling scheme. Yes, he was. He's already been hurt. He's been billed for $4.5 million for the Gulf. How was he hurt by losing money, by having that money used in the oil lease scheme? Because that money dissipated. It was used. He wasn't going to get it back anyway. Well, it was in the account, but then it was dispersed. So that's why he was directly harmed. And the other thing, if the court were looking to draw lines about that and the restitution amount, you have the same victims, as I mentioned, Colonel Dumas, and that's at SER 119, the same beneficiaries, which were the Gulf family. There was the intermingling of the funds, the use of the funds by co-conspirator Stephen Carpenter. It was at the same time, and it was the same actor in Mr. Campa. Your time is up. Thank you very much, counsel. Thank you, Your Honor. All right. The argument has ended on United States v. Gall, and the case will be submitted. We thank counsel for all their arguments.
judges: Kobayashi, Bea, Murguia